# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **REXHEP BULAJ**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Case No. 09 CV 6263** |
| | ) | |
| **WILMETTE REAL ESTATE AND** | ) | |
| **MANAGEMENT COMPANY, LLC**, | ) | |
| **and CAMEEL HALIM, Individually,** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| Defendants. | ) | **October 21, 2010** |

## MEMORANDUM OPINION and ORDER

Before the court is plaintiff Rexhep Bulaj's ("Bulaj") motion for summary judgment on the issue of liability. In his complaint, Bulaj alleges violations of the overtime wage provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and Illinois Minimum Wage Law ("IMWL"), 820 ILL. COMP. STAT. ANN. 105/1 (West 2010) *et seq.*, against defendants Wilmette Real Estate and Management Company, LLC ("Wilmette") and Cameel Halim ("Halim") (together "Defendants"). For the following reasons, Bulaj's motion is granted:

## Facts

Wilmette is a real estate management company. (Pl.'s Facts ¶ 30.)[1] During the time period relevant to this case, 1996 to 2008, Wilmette's principal business was the management

---

[1] Plaintiff's Local Rule ("LR") 56.1(a)(3) Statement of Material Facts is cited as "Pl.'s Facts ¶ __." Defendants' LR 56.1(b)(3)(B) Response to Plaintiff's Statement of Facts is cited as "Defs.' Fact Resp. ¶ __." Defendants' LR 56.1(b)(3)(C) Statement of Additional Material Facts is cited as "Defs.' Facts ¶ __." Plaintiff's Response to Defendants' Statement of Additional Material Facts is cited as "Pl.'s Fact Resp. ¶ __."

of residential properties in the Chicago metropolitan area. (Id.) Wilmette leased apartments in the properties it managed and hired contractors to maintain the various properties. (Defs.' Fact Resp. ¶ 31.) Halim was the President of Wilmette and responsible for Wilmette's day-to-day business operations. (Pl.'s Facts ¶ 32.) Halim had supervisory authority over Wilmette's employees, including those decisions involving the hiring and firing of employees and setting their compensation. (Id. ¶ 33.)

Bulaj worked for Defendants for 12 years as a janitorial and building maintenance worker from September 1996 through July 2008, when he was fired by Halim. (Pl.'s Facts ¶¶ 1, 34.) When Bulaj first began working for Defendants, he was responsible for providing janitorial and building maintenance services for two of Defendants' properties located at 301 Custer Avenue (the "Custer property") and 718 Simpson Avenue (the "Simpson property") in Evanston, Illinois. (Id. ¶ 2.) Defendants instructed Bulaj to perform certain maintenance duties at these two locations. (Id. ¶ 12.) Bulaj's responsibilities generally entailed overseeing building maintenance, including landscaping, cleaning, and repairing the Custer and Simpson properties. (Id. ¶ 4.) He also swept floors, mowed grass, uncloggd toilets, changed light fixtures, and cleaned gutters. (Id. ¶ 24.)

At some point, Bulaj's duties extended to the leasing of apartments at these properties. (Pl.'s Facts ¶¶ 5, 15.) Defendants advertised the availability of apartments at these locations and listed Bulaj's telephone number as the contact number. (Id. ¶ 16.) Bulaj then arranged

to show the apartments to prospective tenants and also cleaned the apartments as directed by Defendants. (Id. ¶¶ 5, 15.)

In May 2006, Defendants again expanded Bulaj's responsibilities and directed him to respond to maintenance calls and to complete work orders at another property located at 6230 Kenmore Avenue (the "Kenmore property") in Chicago. (Pl.'s Facts ¶¶ 3, 6; Defs.' Fact Resp. ¶ 3.) Bulaj reported to work at the Kenmore property from 8:00 a.m. to 12:00 p.m. each weekday and maintained time sheets reflecting the number of hours he worked at the property.[2] (Pl.'s Facts ¶¶ 6, 13.) When Defendants added the maintenance duties at the Kenmore property to Bulaj's assigned responsibilities, his salary did not increase. (Id. ¶ 19.) Instead, Defendants presented a "take it or leave it" proposition to Bulaj that he would have to either accept the additional work or quit his job. (Id.)

Bulaj's day-to-day responsibilities required that he obtain various types of residential maintenance and cleaning supplies from Defendants in order to perform his daily work. (Pl.'s Facts ¶ 20.) Defendants maintained these supplies, which included cleaning products, washers, faucets, mops, medicine cabinets, and towels at one of its branch offices. (Id. ¶ 21; Defs.' Fact Resp. ¶ 21.) In addition to these supplies, Defendants also furnished Bulaj with a cell phone so that he could fulfill his janitorial and maintenance duties at the three properties. (Pl.'s Facts ¶ 23.) Defendants monitored the quality of Bulaj's work at the three

---

[2] Defendants dispute the accuracy of the time sheets Bulaj maintained for his work at the Kenmore property. (Defs.' Fact Resp. ¶ 37.)

properties and would discipline him when it fell below their expectations. (Id. ¶ 14.) Halim personally disciplined Bulaj on numerous occasions. (Id.)

Bulaj developed his maintenance skills before he began working for Defendants. (Defs.' Facts ¶ 8.) Bulaj received training in carpentry, plumbing, and electrical work while attending school and working for a union in New York. (Id.) At his deposition, Bulaj testified that his job with Defendants required "special skills," (id. ¶ 9), and that no one ever told him "how" to do his job, (id. ¶ 3). Bulaj had an extensive collection of tools, which included many different types of saws and drills, hammers, crow bars, wrenches, rod and pipe cutters, and a lawnmower. (Id. ¶¶ 6, 7.) Some of the duties Bulaj performed as a result of having certain special skills included changing pipes, valves, electrical outlets, and light fixtures, and repairing boilers, windows, and doors. (Id. ¶ 2.) When Defendants required work that was outside the scope of Bulaj's duties or expertise, they hired professional contractors, including electricians and carpet installers, to perform those tasks. (Pl.'s Facts ¶ 26; Defs.' Fact Resp. ¶ 26.)

During the course of his 12 years of employment with Defendants, Bulaj was paid a flat bi-weekly salary for his work. (Pl.'s Facts ¶ 7.) Bulaj's compensation also included a rent free apartment at the Custer property, which had a monthly lease value of $1,200. (Id. ¶ 18.) Defendants made regular bi-weekly payroll withholdings from Bulaj's salary for

federal and state income taxes, Social Security and Medicare, and unemployment taxes.[3]  (Id. ¶¶ 10, 29; Pl.'s Ex. C.)  Bulaj was also a member of the Janitor's Union, Local 1 ("Janitor's Union") and participated in the Janitor's Union's health insurance program and pension fund. (Id. ¶ 11.)  Defendants paid a portion of Bulaj's health insurance benefits, which was reflected on his bi-weekly pay statements.  (Id. ¶ 29; Defs.' Fact Resp. ¶ 29; Pl.'s Ex. C.)  Bulaj's pay statements listed Wilmette's name under the "Employer Information" section and noted the account as being a "Payroll Account."  (Id.)  Bulaj's name appeared under the "Personal Information" section, which also included his Social Security number, and employee and department numbers. (Id.)  And, at the very bottom of Bulaj's pay statements, the name of the company that prepared Defendants' payroll accounts was listed as "Payrolls by Paychex, Inc."  (Id.)

Defendants reported Bulaj's annual compensation to taxing authorities by using IRS Form W-2 Wage and Tax Statements ("W-2 Statements").  (Pl.'s Facts ¶ 10; Defs.' Ex. C.) The W-2 Statements list Bulaj as an "employee" and Wilmette as his "employer."  (Id.) Bulaj's 2006 W-2 Statement shows that he earned $29,520 in wages from Wilmette.  (Id.) In 2006, Bulaj also reported $4,800 in compensation he earned from "Freddies Building and Maintenance Service" using IRS Form 1099-Misc ("Form 1099").  (Id.)  Bulaj also completed IRS Schedule C, Profit or Loss from Business (Sole Proprietorship) form

---

[3] Defendants, however, claim that Bulaj explicitly requested that these deductions be made from his bi-weekly salary.  (Defs.' Fact Resp. ¶¶ 10, 29; Defs.' Facts ¶ 12.)

("Schedule C"), where he listed himself as a sole proprietor of a maintenance business. (Id., Defs.' Facts ¶ 14.) On Schedule C, Bulaj reported the following business expenses: (1) car and truck expenses of $4,429; (2) insurance expenses of $854; (3) legal and professional expenses of $450; (4) supply expenses of $365; and (5) utility expenses of $985. (Defs.' Ex. C; Defs.' Facts ¶ 15.) At his deposition, Bulaj explained that he did not own a business in 2006 and that the compensation totaling $4,800 he reported was for maintenance work he performed for his brother-in-law's business. (Pl.'s Fact Resp. ¶ 14; Bulaj Dep. at 82:3-83:20.) Defendants did not present any evidence tending to show that the expenses Bulaj reported in his 2006 Schedule C were related to the work he performed for Defendants.

At some point when Bulaj was considering another employment opportunity, Tom Herkes ("Herkes"), Defendants' Senior Property Accountant, wrote a letter dated December 27, 2006 verifying Bulaj's employment with Wilmette. (Pl.'s Facts ¶ 27, Pl.'s Ex. F.) The letter stated in pertinent part that "Rexhep Bulaj is employed by Wilmette Real Estate & Management as the building janitor at our locations at 301 Custer and 718 Simpson. His hire date is September 1st, 1996." (Id.) While Defendants admit that Herkes provided the letter on Bulaj's behalf, they dispute that he was their employee.

Bulaj testified that he worked a total of 66 hours each week at the Custer, Simpson, and Kenmore properties. (Pl.'s Facts ¶ 36.) He stated that he worked 20 hours each week at the Kenmore property and worked an additional 46 hours each week at the Custer and Simpson properties. (Id. ¶ 38.) Defendants did not maintain any records of the number of

hours Bulaj worked in any individual work week. (Id. ¶ 35.) And, Defendants did not present any evidence to rebut Bulaj's testimony that he worked in excess of 40 hours per week. Furthermore, Halim testified that he never paid Bulaj overtime wages, (id. ¶ 40), and Bulaj's salary did not fluctuate from week-to-week depending on the number of hours he actually worked, (id. ¶ 42). Rather, Defendants' expectation was that Bulaj would complete his job duties no matter how many hours per week he was required to work. (Id. ¶ 41.)

## Analysis

Summary judgment is appropriate when the record establishes that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In deciding whether genuine issues of material fact exist, the court must "review the record as a whole in the light most favorable to the nonmoving party and . . . draw all reasonable inferences in that party's favor." *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 964 (7th Cir. 1998). A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the burden of establishing the basis for its motion and "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The moving party may satisfy this initial burden by presenting specific evidence on a particular issue or by pointing out that there is "an absence of evidence to support the nonmoving party's case." *Id*. at 325. Once the moving party has met its burden, the responsibility shifts to the nonmoving party to show that an issue of material fact exists. *Keri v. Bd. of Tr. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). However, the nonmoving party cannot simply rest on allegations in the pleadings, but "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997).

Summary judgment is neither a substitute for a trial on the merits nor a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after a court draws all reasonable inferences from the facts in favor of the nonmoving party, if genuine issues of material fact remain and a reasonable trier of fact could find for the nonmoving party, summary judgment cannot be entered. *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). Accordingly, summary judgment is precluded "only if sufficient evidence favoring the nonmoving party exists to

permit a jury to return a verdict for that party." *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (citation omitted).

## I.      FLSA Claim

Bulaj contends that Defendants violated the FLSA provision mandating that an employer is prohibited from employing an employee for more than 40 hours in one week unless the employee receives compensation at a rate of one and one-half times the employee's regular rate for all hours worked in excess of 40 hours a week. *See* 29 U.S.C. § 207(a)(1). Here, Bulaj asserts that he was an employee and falls within the scope of the FLSA. Defendants maintain that Bulaj was an independent contractor and is not subject to FLSA's overtime provisions.

It is undisputed that the provisions of the FLSA do not apply unless there is a valid employer-employee relationship. *Secretary of Labor, United States Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1531 (7th Cir. 1987). The FLSA defines an employee as "any individual employed by an employer." *See* 29 U.S.C. § 203(e)(1). When determining whether a worker is an employee under the FLSA, this court is required to apply a "six-factor test to determine the 'economic reality' of the situation." *Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.*, 553 F.3d 559, 565 (7th Cir. 2009) (citing *Lauritzen*, 835 F.2d at 1534). Under this test, "'employees are those who as a matter of economic reality are dependent upon the business to which they render service.'" *Laurtizen*, 835 F.2d at 1534 (quoting *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947)). A court is required to look past

the "technical concepts" of employment and determine if the "economic reality" is such that an individual would be deemed an employee for purposes of the FLSA. *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33 (1961). In order to assess the "economic reality of the nature of the working relationship, courts do not look to a particular isolated factor but to all the circumstances of the work activity." *Lauritzen*, 835 F.2d at 1534. The determination of an individual's employment status is a legal rather than a factual determination. *Karr v. Strong Detective Agency, Inc.,* 787 F.2d 1205, 1206 (7th Cir. 1986).

In the Seventh Circuit, courts consider the following six factors in assessing the economic reality of the working relationship: (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business. *Lauritzen*, 835 F.2d at 1534-35. Each of the criteria "must be applied with [the] ultimate notion in mind" that "dependence . . . indicates employee status." *Id.* at 1538. Applying these six factors to the working relationship between Bulaj and Defendants leads to the conclusion that Bulaj was an employee of Defendants.

**A.     Control Over Manner of Work**

Defendants contend that they did not control the manner in which Bulaj performed his duties. (Defs.' Resp. at 5-7.) Defendants, in relying on *Suskovich*, argue that this court must consider whether Bulaj controlled the details of his work. (Id. at 6.) Defendants point out that Bulaj has presented no evidence that they controlled the details of his work because at his deposition he explicitly denied that anyone ever told him "how" to do his job. (Id. at 7.) Therefore, Defendants assert that they did not dictate the manner in which Bulaj performed his work because the details of his work were within his exclusive control. (Id.)

As an initial matter, Defendants reliance on *Suskovich* for the proposition that this court must consider whether the details of Bulaj's work were within his control is misplaced. In *Suskovich*, the Seventh Circuit noted that there are somewhat different tests for determining an individual's employment status under the common law, FLSA, and ERISA. 553 F.3d at 565. The district court in *Suskovich* followed the criteria set forth in the Restatement (Second) of Agency § 220 and the Seventh Circuit agreed that this set of criteria was appropriate because the Estate invoked the Restatement test and waived its argument that the broader FLSA standard ought to apply to the case. *Id*. at 565 n. 1. The Seventh Circuit reasoned, "[g]iven that the majority of the claims in this case revolve around the bare question of employment status and the Restatement test is generally equivalent to the common law test from [*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992)], that test provides the best means of resolving the main employment question before us." *Id.*

at 565.  The Seventh Circuit examined the ten-factor Restatement criteria and concluded that

Suskovich's employment status was that of an independent contractor.[4]  Here the parties have

agreed that the appropriate criteria to use in analyzing employee status under the FLSA is the

six-factor test employed by the Seventh Circuit.[5]  *See Lauritzen*, 835 F.2d 1534-35.

With regard to the control factor, the court considers whether Defendants had "the

right to dictate the manner in which" Bulaj performed his job.  *Lauritzen*, 835 F.2d at 1536.

---

[4]  Under the Restatement (Second) of Agency § 220 test, a court examines the following ten factors:

> (1) the extent of control which, by the agreement, the master may exercise over the details of the work; (2) whether or not the one employed is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the person is employed; (7) the method of payment, whether by the time or by the job; (8) whether or not the work is part of the regular business of the employer; (9) whether or not the parties believe they are creating the relation of master and servant; (10) whether the principal is or is not in business.

*Suskovich*, 553 F.3d at 565-66.

[5]  The Seventh Circuit has explained that the definition of employee is broader under the FLSA than under "'traditional agency law principles,'" *Reyes v. Remington Hybrid Seed Co., Inc.,* 495 F.3d 403, 408 (7th Cir. 2007) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992), or under Title VII.  *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991).  Therefore, "[i]t is well recognized that under the FLSA the statutory definitions regarding employment are broad and comprehensive in order to accomplish the remedial purposes of the Act.  Courts, therefore, have not considered the common law concepts of 'employee' and 'independent contractor' to define the limits of the Act's coverage."  *Lauritzen*, 835 F.2d at 1534.

And "[e]vidence tends to show control by an employer when it reflects the employer's dominance over the 'manner and method' of how work is performed." *Harper v. Wilson*, 302 F.Supp.2d 873, 878 (N.D. Ill. 2004) (citing *Carrell v. Sunland Constr.,* 998 F.2d 330, 332 (5th Cir. 1993)).  A review of the record in this case shows that Defendants had full control over its business and those tasks assigned to Bulaj.

First, Defendants exercised control over the manner of Bulaj's work by instructing him to perform specific janitorial and building maintenance duties at the Custer, Simpson, and Kenmore properties.  Although Bulaj exercised discretion in the performance of his duties because he was not told "how" to do his job, the record establishes that Defendants controlled the manner in which he performed his work by setting his work schedule, monitoring the quality of his work, and disciplining him when his work did not meet Defendants' expectations.  As Bulaj correctly points out, Defendants' right to impose their expectations on Bulaj and terminate him when he failed to meet those expectations is indicative of the fact that they controlled the manner of his work.  *Harper*, 302 F.Supp.2d at 878 ("Defendants imposed their expectations on their managers and would fire those who did not meet their expectations.").  Here, Halim ultimately terminated Bulaj on the basis of unsatisfactory work performance.

Second, Defendants required that Bulaj take on the responsibilities of responding to maintenance calls and completing work orders at the Kenmore property without any additional compensation.  Defendants also mandated that Bulaj report to work at that

property from 8:00 a.m. to 12:00 p.m. each weekday. Thus, the undisputed facts demonstrate that Defendants controlled Bulaj's manner of work because they exercised "pervasive control" over the business as a whole. *Lauritzen*, 835 F.2d at 1536. Accordingly, because no reasonable trier of fact could conclude that Bulaj possessed anything other than an incidental amount of control, this factor weighs in favor of Bulaj.

### B. Opportunity for Profit and Loss

Defendants contend that Bulaj had the opportunity for additional profit or loss because he owned his own maintenance business. (Defs.' Resp. at 8.) Defendants argue that Bulaj's total income was predicated on his ability to manage his work hours with Wilmette so as to enable him to take on additional contracting jobs and increase his business's profits. (Id.) Furthermore, Defendants point out that Bulaj's financial outlay for his business in 2006 and his large investment in tools and equipment represent not only a potential profit for him, but also a potential loss. (Id.)

The court cannot agree with Defendants' position with regard to this factor. Even if Bulaj did own a business in 2006, the fact that he had the opportunity for additional profit or loss from that business had no relevance whatsoever to whether he also had an opportunity for profit or loss as a result of his work for Defendants. The uncontested facts show that Bulaj had no opportunity for additional profit or loss from his janitorial and maintenance work for Defendants because his compensation consisted of a fixed, bi-weekly salary and a rent free apartment. Accordingly, this second factor weighs in Bulaj's favor because no

reasonable trier of fact could conclude that he had an opportunity for additional profit or loss on the basis of the work he performed for Defendants.

### C.    Investment in Equipment or Materials

Defendants assert that the third factor weighs in favor of a finding that Bulaj is an independent contractor rather than an employee because Bulaj made a substantial financial investment in his own maintenance business by purchasing an extensive collection of tools. (Defs.' Resp. at 9.)  Thus, Defendants claim that Bulaj's substantial investment depicts a situation that is analogous to that of an independent contractor rather than an employee.  (Id.)

The court disagrees.  A review of the record establishes that Bulaj's capital investment in the tools he used in his work for Defendants was minimal.  While it is clear that Bulaj owned some tools, Defendants furnished him with the majority of the supplies and materials he needed to perform his day-to-day duties.  These included cleaning products, washers, faucets, mops, medicine cabinets, and towels, which were maintained by Defendants at a branch office. And, on one occasion, Defendants reimbursed Bulaj for a saw blade he used in the performance of his duties.  (Pl.'s Facts ¶ 22.)  Thus, Defendants essentially provided Bulaj with all of the supplies and materials he needed to perform his assigned duties.  *See Lauritzen*, 835 F.2d at 1537 (noting that when everything from "farm equipment, land, seed, fertilizer, [and] insecticide to the living quarters of the migrants is supplied by the defendants" that the investment factor weighs in favor of employee status).  Accordingly, because Bulaj's principal investment in tools consisted of only a few necessary hand tools

and because Defendants supplied almost all of the required materials for his work, no reasonable trier of fact could find that the investment factor weighs other than in Bulaj's favor.

### D. Requirement of Special Skill

Defendants assert that even though some of Bulaj's tasks required no special skills, the special skill factor still weighs in their favor because many of his tasks required special skills. (Defs.' Resp. at 9-10.) Defendants point out that Bulaj testified that his work required special skills and that he acquired these skills while attending school and working for a union in New York where he received training in carpentry, plumbing and electrical work. (Id. at 10.) Bulaj applied his special skills by changing pipes, valves, electrical outlets, and light fixtures, and repairing boilers, windows, and doors at Defendants' properties. (Id.)

The record shows that the majority of Bulaj's day-to-day tasks principally entailed rudimentary janitorial and building maintenance skills. For example, Bulaj was responsible for cleaning, sweeping floors, mowing grass, unclogging toilets, changing light fixtures, and cleaning gutters. Bulaj also served as a contact person and scheduled appointments to show apartments to prospective tenants. When Defendants required work that was outside the scope of Bulaj's expertise, they hired professional contractors, such as electricians and carpet installers, to complete the task. Halim also testified that Defendants did not ask Bulaj "to do a professional job, like an official plumber. But anything a handyman can do." (Halim Dep. at 48:18-21.) Furthermore, the fact that Bulaj received training and education in certain

specialized trades, including carpentry, plumbing, and electrical work does not militate a finding in favor of independent contractor status because "[s]kills are not the monopoly of independent contractors." *Lauritzen*, 835 F.2d at 1537. Accordingly, because no reasonable trier of fact could conclude that Bulaj's work for Defendants required special skills, this factor weighs in his favor.

### E. Degree of Permanency and Duration of Relationship

Defendants aver, relying on Judge Easterbrook's concurring opinion in *Lauritzen*, that the 12-year working relationship between Bulaj and Defendants is not necessarily indicative of an employer-employee relationship. (Defs.' Resp. at 10-11.) Rather, Defendants point out that although the length of the relationship between Bulaj and Defendants can be measured, "it is hard to see why it is significant." *Lauritzen*, 835 F.2d at 1541. Judge Easterbrook explained in *Lauritzen*, in a concurring opinion that, "[l]awyers may work for years for a single client but be independent contractors; hamburger-turners at fast-food restaurants may drift from one job to the next yet be employees throughout." *Id.* Therefore, Defendants contend that their 12-year working relationship with Bulaj counts for little, if any, in determining the economic reality of whether he was an employee or independent contractor. (Id.) But, aside from pointing out Judge Easterbrook's concurring opinion, Defendants failed to persuade the court that it should ignore the 12-year relationship.

Bulaj worked for Defendants as a janitorial and maintenance worker for a 12-year period during which he was required to perform his job duties on a daily basis. Furthermore,

Bulaj lived in an apartment located at the Custer property, which Defendants provided to him rent free. Given the permanency and duration of the working relationship between Bulaj and Defendants, no reasonable trier of fact could conclude that this factor does not weigh in Bulaj's favor.

Plus, Defendants reported Bulaj's annual compensation to taxing authorities using W-2 Statements and also made regular bi-weekly payroll withholdings from his salary for federal and state income taxes, Social Security and Medicare, and unemployment taxes. (Pl.'s Reply at 1-3; Defs.' Ex. C.) Bulaj also points out that Defendants paid a portion of his health insurance premiums and that he was a member of the Janitor's Union. (Id.)

Defendants, however, aver that Bulaj specifically requested that deductions for income, payroll, and unemployment taxes be made from his bi-weekly salary. (Defs.' Fact Resp. ¶¶ 10, 29; Defs.' Facts ¶ 12.) Thus, Defendants contend that Bulaj was an independent contractor and not an employee. But, Defendants failed to provide sufficient evidence and explanation to raise an inference in their favor that the W-2 Statements and the typical deductions and contributions made for "employees" were made notwithstanding Bulaj's independent contractor status.

The Seventh Circuit has found that tax forms and tax returns are indispensable when determining whether a worker is an employee or independent contractor. *Suskovich*, 553 F.3d at 568 (when analyzing the method of payment factor under the Restatement test "tax forms and tax returns are essential when deciding which status this factor favors."). When

18

considering a party's tax treatment, courts consider whether a party filed a W-2 Statement or Form 1099. *Mazzei v. Rock-N-Around Trucking Inc.*, 246 F.3d 956, 964-65 (7th Cir. 2001); *EEOC v. North Knox Sch. Corp.*, 154 F.3d 744, 750 (7th Cir. 1998). Furthermore, "issuing 1099 forms, which are used for non-employee compensation, 'would be appropriate for independent contractor status.'" *Suskovich*, 553 F.3d at 568 (citing *North Knox Sch. Corp.*, 154 F.3d at 750)).

Bulaj's worker status can be properly characterized as that of an employee because Defendants used W-2 Statements to report his annual salary to taxing authorities. The W-2 Statements provided to Bulaj by Defendants listed Bulaj as an "employee" and Defendants as his "employer." And there is no evidence to suggest that Bulaj was an independent contractor because Defendants did not report his compensation using a Form 1099 during the entire 12-year period that he worked for them. Furthermore, Defendants held out Bulaj as their employee because they made regular bi-weekly withholdings for income, payroll and unemployment taxes from his salary, and paid a portion of his health insurance benefits available through the Janitor's Union.

Bulaj was also identified as an employee under Defendants' payroll system. For instance, Bulaj's bi-weekly pay statements listed Wilmette's name under the "Employer Information" section and noted the account as being a "Payroll Account." Bulaj's name appeared under the "Personal Information" section, which also included his Social Security number, and employee and department numbers. And at the very bottom of Bulaj's pay

statements, the name of the company that prepared Defendants' payroll accounts was listed as "Payrolls by Paychex, Inc." again identifying the bi-weekly checks as payroll checks. The record shows that Defendants treated Bulaj as their employee and not an independent contractor. *See Ins. Benefit Adm'rs v. Martin*, 871 F.2d 1354, 1357 (7th Cir. 1989) (a party's denial of "employee" status in the face of similar facts is not only improper, but sanctionable).

Furthermore, other factors weigh in favor of Bulaj. Bulaj was a member of the Janitor's Union. Union members by definition are employees, not independent contractors. *See L.A. Meat & Provision Drivers Union, Local 626 v. United States*, 371 U.S. 94, 108 (1962). Also, Defendants furnished Bulaj with a letter attesting to his employment with them and specifically identified Bulaj as their employee. Moreover, the record is devoid of any evidence that there was a written service contract between the parties, or that Bulaj invoiced his work in order to get paid.

## F. Integral Part of Business

Defendants assert, based on Judge Easterbrook's concurring opinion in *Lauritzen*, that while some of Bulaj's work duties may have been integral to their business that does not necessarily mean that an employer-employee relationship has been established between the parties. (Defs.' Resp. at 11-12.) Defendants point out that Judge Easterbrook expressed his view that the sixth factor has little significance stating that the "extent to which the service rendered is an integral part of the employer's business is one of those bits of 'reality' that has

neither significance nor meaning. *Everything* the employer does is 'integral' to its business-why else do it?" *Lauritzen,* 835 F.2d at 1541 (emphasis in original). Therefore, Defendants assert that the sixth factor does little to shed light on the economic reality of whether Bulaj was an employee or independent contractor.

The fact that Judge Easterbrook has opined that the sixth factor has no meaning is neither here nor there in this case. First, this court must apply the six-factor test and is not authorized to redefine the necessary factors to be applied in these types of cases. Second, under the circumstances in this case, whether the sixth factor has little significance is of no consequence because the first five factors all weigh in favor of Bulaj's position.

The sixth factor weighs in favor of Bulaj as his janitorial and maintenance work was an integral part of Defendants' management business. There can be no dispute that Wilmette would lose its customers and accounts if the properties it was hired to manage were in disrepair and dirty. As discussed throughout this opinion, Bulaj's daily duties included cleaning, sweeping floors, mowing grass, unclogging toilets, changing light fixtures, and cleaning gutters. He also received telephone calls and scheduled appointments to show apartments to prospective tenants. At times, Bulaj was also required to change pipes, valves, electrical outlets, and light fixtures, and repair boilers, windows and doors at the three properties. Bulaj's duties—cleaning, maintaining and repairing—can be fairly characterized as duties integral to Defendants' business, which principally entails managing and leasing

apartments. Therefore, no reasonable trier of fact could conclude that the integral services factor weighs other than in favor of Bulaj even if the weight is insignificant.

For the foregoing reasons, the court finds as a matter of law that Bulaj was an employee of Defendants and not an independent contractor. Because Defendants failed to sufficiently dispute that Bulaj worked in excess of 40 hours per week, their failure to pay overtime pay violated the FLSA.[6]

## II.  IMWL Claim

Bulaj also claims that Defendants violated the IMWL by failing to pay him for his overtime work. Under the IMWL, an employer is required to pay an employee who works more than 40 hours a week at a rate one and a half times the employee's regular rate for all hours worked in excess of 40 hours in a week. 820 ILL. COMP. STAT. ANN. 105/4(a)(1) (West 2010). Under the Illinois Administrative Code, the following six factors are used in evaluating whether a worker is an employee or independent contractor: (1) the degree of control the alleged employed exercised over the individual; (2) the extent to which the services rendered by the individual are an integral part of the alleged employer's business; (3) the extent of the relative investments of the individual and alleged employer; (4) the degree to which the individual's opportunity for profit and loss is determined by the alleged employer; (5) the permanency of the relationship; and (6) the skill required in the claimed

---

[6]  Defendants do not dispute that Wilmette and Halim are employers within the meaning of the FLSA.  (*See* Defs.' Fact Resp. ¶ 8.)

independent operation. *Lizak v. Great Masonry, Inc.*, No. 08 C 1930, 2009 WL 3065396, at *8 (N.D. Ill. Sept. 22, 2009) (citing 56 Ill. Adm.Code § 210.110)). Therefore, the inquiry for determining employment status under the IMWL is essentially the same as that under the FLSA. *Id.* For the reasons discussed *supra*, Bulaj's status was that of an employee and not an independent contractor. Because Defendants failed to dispute that Bulaj worked in excess of 40 hours per week and that they failed to pay Bulaj overtime wages, their conduct violated the IMWL.[7]

## Conclusion

For the foregoing reasons, Bulaj's motion for summary judgment on liability is granted.

**ENTER:**

_____
**Young B. Kim**
**U.S. Magistrate Judge**

---

[7] Defendants do not dispute that Wilmette and Halim are employers within the meaning of IMWL.